Barbara LLEWELLYN, Plaintiff,

v.

CELANESE CORPORATION and
Celanese Fibers Operations,
Defendants.

No. C–C–85–254–M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

March 1, 1988.

George Daly, Charlotte, N.C., for plaintiff.

M. Daniel McGinn, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, N.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McMILLAN, District Judge.

Plaintiff Barbara Llewellyn brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging unlawful discrimination based on sex, in violation of 42 U.S.C. § 2000e–2(a). Plaintiff complains that she was subjected to a hostile and offensive work environment on account of her sex, and that her employer failed to take adequate remedial action.

The case was tried to the court on September 28 to 30, 1987. Upon review of the evidence of record, the court finds as follows:

1. Defendant Celanese Corporation is a Delaware corporation. Its principal place of business is in New York City, New York. Defendant Celanese Fibers Operations is a division of Celanese Corporation. The principal place of business of Celanese Fibers Operations is in Charlotte, North Carolina. Both defendants do business within the judicial district of this court.

2. At all times pertinent to this action, plaintiff Barbara Llewellyn, a woman, was

employed by the Celanese Trucking Division of Celanese Fibers Operations as an over-the-road truck driver. The Celanese Trucking Division is located in Rock Hill, South Carolina.

3. Plaintiff's employment duties consisted of driving a Celanese owned and maintained tractor-trailer rig and associated tasks. Plaintiff hauled freight for Celanese Trucking Division of Celanese Fibers Operations to locations in several states, including Virginia, North Carolina and South Carolina.

4. Plaintiff alleged incidents of sexual harassment by other Celanese employees and customers. Some of the incidents were alleged to have occurred in Mecklenburg County, Gaston County, Cleveland County, and Iredell County, North Carolina. Those counties are within the judicial district of this court.

5. Plaintiff began her employment with defendants on July 11, 1980. She remained an active employee until August 18, 1983, when she went on medical leave. Plaintiff returned to work with defendants in November, 1986, and was employed by defendants at the time of trial.

6. Plaintiff is a skilled and competent truck driver.

7. Beginning early in her employment with defendants, and continuing until her medical leave on August 18, 1983, plaintiff was the victim of unwanted sexual propositions, unwanted sexual touching, unwanted and involuntary exposure to nude male co-employees and threats of violence against her personally by Celanese employees and, on at least one occasion, by a Celanese customer.

8. In 1980, while plaintiff was asleep in her truck outside a truck stop in Joanna, South Carolina, a male Celanese driver named David Glasgow entered her truck without plaintiff's permission and left after plaintiff awoke and confronted him. Plaintiff reported this incident to her dispatcher, Pat Campbell, and her supervisor, Joe Snyder. Snyder subsequently caused the lock on her truck to be changed.

9. In 1981, plaintiff stopped her truck at Fuel City, North Carolina. She parked her truck between two other Celanese trucks, and left the vehicle to go inside the truck stop. She returned, and, after she began to drive, the trailer slipped off her tractor because the pin linking them had been removed. Plaintiff reported the incident to her supervisor, and gave him the numbers of the other two trucks. Celanese supervisory personnel failed to investigate or take any disciplinary action concerning this incident.

10. In 1981, plaintiff was a co-driver with Bill Seville, another Celanese employee. While plaintiff and Seville were stopped at the Waffle House in Gastonia, North Carolina, Seville made a verbal sexual advance toward plaintiff, and threatened her with harm if she reported the sexual advance. Plaintiff did not report this incident.

11. Seville also made a verbal sexual advance in a subsequent conversation with plaintiff over the CB radios of their trucks. Plaintiff did not report this incident.

12. In 1981, plaintiff stopped her truck in a shopping center parking lot near Mooresville, North Carolina. Another Celanese driver, Davis Pagett, had parked his truck nearby. Pagett asked plaintiff to assist him with some of the wiring in the cab of his truck. Plaintiff stepped into the cab to help, and Pagett grabbed plaintiff around her chest from behind, and attempted to drag her into the sleeper compartment of the cab. Plaintiff resisted this advance and broke away from Pagett's grip. Plaintiff did not report this incident.

13. In 1981, plaintiff made a delivery to a Celanese customer located in Albemarle, North Carolina. A male supervisory employee at the customer's plant asked plaintiff to come into his office while he signed the necessary receipts for delivery. While plaintiff was in the office, the supervisor made an unwelcome sexual advance to her by touching her breast. Plaintiff immediately left the office and reported the incident to her dispatcher over her CB radio. Plaintiff also complained in person to Chet Moody, the Celanese safety director, when

she returned to the Rock Hill terminal. Mr. Moody told her that "the customer is always right" and that she should stay away from that person in the future. Plaintiff requested that she not be sent back to that customer. The company did not send her back to that customer for some time after the incident.

14. In 1981, while plaintiff was on the Rock Hill terminal lot, a Celanese "spotter" driver ("Larry") made an unwelcome verbal sexual advance to her and touched plaintiff on the arm. A "spotter" is a driver who moves tractors and trailers around the terminal lot. Plaintiff reported this incident to her dispatcher. Celanese supervisory personnel failed to investigate the incident or take any disciplinary action.

15. In 1982, at the plant of a Celanese customer in Lawndale, North Carolina, Gene Krampf, another Celanese driver, engaged plaintiff in a conversation. Krampf asked plaintiff if she knew the identity of a driver rumored to be homosexual. Plaintiff refused to discuss the matter with Krampf. Krampf told plaintiff that he would tell other drivers in the "37 club" that he had sex with plaintiff if she did not tell him the identity of the gay driver. The "37 club" was a group of 37 male Celanese drivers who bet on which man among them would be the first to have sex with plaintiff. Plaintiff reported this incident and the existence of the "37 club" to her dispatcher. Celanese supervisory personnel failed to investigate this incident or take any disciplinary action.

16. In 1982, on the Celanese terminal lot in Rock Hill, South Carolina, Gene Krampf again initiated a conversation with plaintiff. Krampf told plaintiff that he heard that Joe Snyder, plaintiff's supervisor, had been caught shoplifting at the K–Mart in Rock Hill. Krampf asked plaintiff to report a false accusation to John Eason, Plant Manager, that Snyder had made an unwelcome sexual advance toward plaintiff. Plaintiff refused and subsequently reported to Joe Snyder that Krampf had stated to her what he had heard about Snyder and that Krampf had attempted to induce plaintiff to make a false accusation of sexual harassment against Snyder. Snyder discussed the incident with Krampf. However, Celanese supervisory personnel took no disciplinary action against Krampf despite the fact that Snyder, according to his testimony, viewed the matter as serious.

17. In 1982, plaintiff stopped at the Celco, Virginia, Celanese terminal. The Celco terminal has a break area for drivers, including a restaurant area and restrooms. There is a shower and dressing area in the men's restroom, but no shower or dressing area in the women's restroom. In order to take a shower, plaintiff's practice was to wait for all the male drivers to finish showering, and then ask them to "stand watch" for her while she showered in the men's restroom.

18. On this occasion in 1982, plaintiff requested this arrangement with the group of male drivers present. One of the male drivers told her they had finished showering and the men's restroom was vacant. In fact, a male driver, Frank Young, was still in the shower. Plaintiff, relying on the other drivers' statements that the shower was vacant, entered the restroom and saw Frank Young in the shower. Plaintiff immediately turned and left the restroom, and walked out of the terminal to her truck. When plaintiff left the restroom, she saw that the group of male drivers was looking at her. As plaintiff walked past the group of male drivers, she remarked, "Frank has a cute ass," because she didn't want them to see her true feelings of embarrassment, anger and humiliation. Plaintiff complained about this incident to her dispatcher. Celanese supervisory personnel made no investigation and took no remedial or disciplinary action in response to her complaint.

19. In 1982, plaintiff parked her truck in a truck stop near McBee, South Carolina. Other Celanese trucks were parked nearby. Plaintiff left her truck and went inside the truck stop. When plaintiff returned to her truck, she found a live snake, between one and two feet long, on the floor of the driver's side of the cab. Plaintiff was shocked and frightened by this experience.

20. Celanese employees had known that plaintiff has a strong fear of snakes prior to the McBee incident. Plaintiff had seen a snake at the Rock Hill Celanese terminal and had displayed her fear by screaming. Several Celanese employees were present at the time.

21. Plaintiff reported the McBee incident to her supervisor, Joe Snyder. Snyder told plaintiff that the snake could have gotten into the cab by crawling up the tire, along the steering column of the truck and through a small hole next to the steering column in the floor of the cab. Neither Mr. Snyder nor any other Celanese employee made a further attempt to investigate the incident, or took remedial or disciplinary action.

22. On April 24, 1983, plaintiff married another Celanese driver, John Llewellyn. In the morning before the wedding, plaintiff found a scrawled note in the screen door of her home. The note said "Llewellyn—We will get you son of a bitch. Death." John Llewellyn brought the note to the Rock Hill terminal the next day and reported the incident to Joe Snyder. Celanese employees attempted but were unable to match the note with the handwriting of any Celanese employee.

23. On July 20, 1983, plaintiff stopped her truck at the Celanese terminal in Celco, Virginia. She went inside the terminal to rest and use the food and restroom facilities. Plaintiff stopped to converse with some other drivers. She then proceeded toward the restroom area to use the women's restroom.

24. At the Celanese facility in Celco, the doors to the restrooms are located on a single hallway. The women's restroom may only be reached by passing the door of the men's restroom.

25. As plaintiff entered the hallway, she observed a broom sticking out of the doorway of the men's restroom. The broom partially blocked access to the women's restroom. The broom was wedged in between the door and the door frame, propping the door open. When plaintiff passed the doorway to the men's restroom, she noticed someone standing in it. She then saw Gene Krampf, standing naked near the doorway, intentionally exposing his genitals to her. Plaintiff was shocked, embarrassed, upset and angered by the encounter.

26. Plaintiff subsequently reported the incident by telephone to Joe Snyder, her supervisor. On July 22, 1983, plaintiff returned to the Rock Hill terminal and reported the incident in person to John Eason, plant manager of the Rock Hill terminal. She also made a written statement of her complaint that same day. Eason asked plaintiff to refrain from discussing her complaint with anyone until Celanese was able to investigate.

27. Later on July 22, 1983, plaintiff received an anonymous call on her CB radio while plaintiff was driving her truck on Celanese business near Mooresville, North Carolina. Mooresville is located in Iredell County. The caller threatened to cause plaintiff bodily harm if she reported the July 20 incident at the Celco plant involving Gene Krampf to her supervisors. Plaintiff subsequently reported this threat to Joe Snyder.

28. Between July 23 and August 13, 1983, plaintiff received a similar anonymous threat of bodily harm over the CB radio while driving her Celanese truck in the course of her employment near Salem, Virginia. Plaintiff reported this threat to Don Marshall, a Celanese supervisory employee.

29. On August 16, 1983, plaintiff met with Jim Gaffney, labor relations specialist, and John Eason at the Rock Hill terminal to discuss the July 20 incident. Plaintiff and her husband, John Llewellyn, both requested that he [John Llewellyn] be present at the meeting. Eason and Gafney refused this request.

30. At the meeting, Eason informed plaintiff that Gaffney had met with Krampf and had discussed the incident with him. Eason also stated that Celanese had decided to discipline Krampf by placing a warning letter in his file. A letter was placed in Krampf's personnel file. The letter states:

"In accordance with our present Contractual Agreement in compliance with Article 8. *Discipline* page # 4 Section (e):
"Discipline may be discharge, suspension, written or oral warning. With respect to discharge or suspension, the Employer must give at least one (1) warning notice of the specific complaint against such employee in writing.
"We refer you to the incident which occurred at the Celco Plant on July 20, 1983, when you were accused of sexually harassing another employee of the Celanese Trucking Division. Celanese Trucking cannot and will not condone this kind of activity.
"Since you admit that you were responsible for the incident although it was unintentional, this letter will serve as a warning notice; and any future acts on your part will be cause for disciplinary action up to and including discharge."

31. Plaintiff feared for her safety because she believed that the letter would only enrage Krampf. She asked Eason if Celanese could take steps to guarantee her safety on the road. Eason responded by stating that Celanese could not guarantee her safety and suggested that plaintiff "pull herself together."

32. Eason was the Celanese employee responsible for investigating the July 20 incident, determining fault, and deciding whether, and in what form, discipline would be administered. Eason knew that Jim Helms, another driver, had been in the men's restroom area just prior to the exposure incident. However, Eason did not interview Helms, nor did he obtain any written version of the facts Helms knew. Eason testified at trial that he had the two statements by plaintiff and Krampf, and spoke with a Celanese employee at the Celco terminal only about the physical layout of the terminal.

33. Between July 23 and August 16, 1983, plaintiff repeatedly asked Eason about the investigation of her complaint. Eason told plaintiff on those occasions that he had no information for her. Although Gene Krampf was present at the Rock Hill terminal on Tuesday, July 26, Krampf was not interviewed regarding plaintiff's complaint until August 8, 1983, despite the fact that plaintiff had reported receiving on July 23 a threat of bodily harm if she complained about the July 22 incident.

34. Eason testified at trial that he used the written statements from plaintiff and Krampf to determine the truth of plaintiff's allegations. Eason also testified that he decided that the versions of events contained in the statements did not significantly differ. Eason admitted on cross-examination that the discipline Krampf received was only for the conduct he [Krampf] admitted in his statement.

35. Eason's assessment that the versions are "not significantly different" is contradicted by the plain language of the statements in Eason's possession at the time he decided to write Krampf a warning letter.

36. Plaintiff stated, "... I was exposed to indecent exposure by one of our employees Gene Krampf whom [sic] was standing at the door which was propped open with a broom, standing there nude smiling ..." (Plaintiff's exhibit 12, signed statement by Barbara Llewellyn to Celanese concerning July 20, 1983, dated July 22, 1983).

37. Krampf stated, " ... Approaching the shower room I found driver Helms had finished his shower. At this time, I made the remark to him that it is so hot you can hardly stand it. I picked up the broom, using the handle to crack open the door. This space was no bigger than 4″ at the most as the broom handle was placed in the crack of the door. Sometime during my stay in the shower room, Ms. Llewellyn apparently looked in, and 'was embarrassed' ... Immediately after I was out of the shower, I was partially dressed. I did not see Ms. Llewellyn anytime [sic] during my stay in the shower nor did I know she was anywhere in the area ..." (Plaintiff's Exhibit 107, signed statement by Gene Krampf to Celanese concerning July 20, 1983, dated August 8, 1983).

38. The warning letter placed in Krampf's file states that the incident was "unintentional."

39. Plaintiff became very upset at the conclusion of the August 16, 1983, meeting with Eason and Gaffney because she believed that the letter was inadequate discipline and would make Krampf and other drivers angry and dangerous.

40. Celanese supervisory personnel failed to take any further investigatory or disciplinary action, despite plaintiff's reasonable fear for her safety.

41. Plaintiff and her husband left Rock Hill shortly thereafter to haul Celanese cargo to Maryland. During the course of the trip, while plaintiff was driving, she began to shake uncontrollably. Her husband drove the truck for the rest of the trip. Plaintiff was very upset and could not drive or eat.

42. Plaintiff returned to Rock Hill on August 17, 1983, and immediately sought medical attention. She testified that she was crying, depressed, felt nauseous and wanted to die. As a result of this visit, plaintiff was placed on psychotrophic medication for treatment of her depression and anxiety. Plaintiff went on medical leave from her employment on August 18, 1983.

43. During the latter half of August or early September, 1983, plaintiff developed a seizure disorder which, according to her physicians, resembled the symptoms of persons suffering from epilepsy. Plaintiff continued to experience these seizures between that time and the time she filed her charge of discrimination with the Equal Employment Opportunity Commission. The seizures were electronically documented by her neurologist, Dr. Dennis Goetelfinger, in the spring of 1984. On the recommendation of Dr. Goetelfinger, plaintiff in May, 1984, saw Dr. Penry of Bowman Gray Medical Center in Winston–Salem, North Carolina, and was tested to determine if her seizures were epileptic. Drs. Penry and McCabe concluded on May 18, 1984, that her seizures were not due to epilepsy and were probably psychogenic.

44. Between August, 1983, and May, 1984, plaintiff suffered from anxiety and depression.

45. During this period plaintiff ingested prescribed medications in varying combinations and dosages. The medications included Dilantin, Phenobarbital, Librium, Cloplin, Donazapan, Ritalin, Zanax, Clonopin, Dalmate, and Valium.

46. The combined effect of her depression and the medications rendered plaintiff unable to attend to everyday activities such as washing dishes, cleaning her home, and caring for her children. Her parents took her children to buy food. Her children cleaned the house. She spent most of her time sleeping. When she awoke she had trouble walking down the hall of her trailer to the kitchen. She experienced a lump in her throat, had difficulty eating, would frequently vomit what she had eaten, and had chronic diarrhea.

47. After plaintiff's seizure disorder was diagnosed as probably psychogenic, she began to receive more intensive psychotherapy from her psychiatrist, Dr. Hayne McMeekin. As Dr. McMeekin testified at his deposition:

"I was seeing her about monthly. I was not really doing psychotherapy. What I was doing was just sort of watching her until we got this thing about the seizures, just sort of monitoring and seeing what was happening.

"... And then the next thing [documents in his medical file] is from Dr. Penry in Bowman Gray, that there was no seizure disorder, and that it was all anger and rage and problems working from the alleged problems at work."

Deposition of Dr. Hayne D. McMeekin, at 33 (Defendant's exhibit 1).

The combined effect of plaintiff's depression and anxiety, her seizure symptoms, and the drugs she ingested, was sufficient to incapacitate her and to undermine her ability to exercise her will and accomplish acts she might wish to accomplish. She did not receive meaningful psychotherapy until after May 18, 1984.

48. Dr. McMeekin provided plaintiff with a referral to a lawyer in the first week of June, 1984. Plaintiff first met with an attorney and became aware of her obligation to file a charge of discrimination with the EEOC on July 13, 1984.

49. Prior to August 18, 1983, defendants had posted on an employee bulletin board two notices. The texts of the notices are as follows:

EQUAL EMPLOYMENT OPPORTUNITY
AFFIRMATIVE ACTION COMPLIANCE PROGRAM
*EQUAL EMPLOYMENT POLICY*

*January 1, 1983*

IT IS THE POLICY OF THE TRUCKING DIVISION TO:
(1) RECRUIT, HIRE, TRAIN, AND PROMOTE PERSONS IN ALL JOB TITLES, WITHOUT REGARD TO RACE, CREED, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, HANDICAP, OR STATUS AS DISABLED OR VIETNAM–ERA VETERANS.
(2) BASE DECISIONS ON EMPLOYMENT SO AS TO FURTHER THE PRINCIPLES OF EQUAL EMPLOYMENT OPPORTUNITY/AFFIRMATIVE ACTION.
(3) ENSURE THAT PROMOTION DECISIONS ARE IN ACCORD WITH PRINCIPLES OF EQUAL EMPLOYMENT OPPORTUNITY/AFFIRMATIVE ACTION BY IMPOSING ONLY VALID REQUIREMENTS FOR PROMOTIONAL OPPORTUNITIES.
(4) ENSURE THAT ALL PERSONNEL ACTIONS SUCH AS COMPENSATION, BENEFITS, TRANSFERS, LAY–OFFS, RETURN FROM LAY–OFFS, EDUCATION, TUITION ASSISTANCE, SOCIAL AND RECREATION PROGRAMS ARE ADMINISTERED WITHOUT REGARD TO RACE, CREED, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, HANDICAP OR STATUS AS DISABLED OR VIETNAM–ERA VETERANS.
(5) ENSURE THAT EMPLOYEES AND APPLICANTS ARE PROTECTED FROM COERCION, INTIMIDATION, INTERFERENCE OR DISCRIMINATION FOR FILING COMPLAINTS OR ASSISTING IN INVESTIGATIONS UNDER EQUAL EMPLOYMENT OPPORTUNITY LAWS.

ANY QUESTIONS RELATING TO THE TRUCKING DIVISION'S AFFIRMATIVE ACTION PROGRAM SHOULD BE REFERRED TO J.T. GAFFNEY, LABOR RELATIONS REPRESENTATIVE WHO HAS BEEN DESIGNATED AS THE EQUAL EMPLOYMENT OPPORTUNITY OFFICIAL OF THE TRUCKING DIVISION.

| /s/ J.T. Gaffney | /s/ John S. Eason |
|---|---|
| J T. GAFFNEY<br>1/R L/R REPRESENTATIVE | JOHN S. EASON<br>MANAGER<br>CELANESE TRUCKING DIVISION |

"Celanese Trucking Division EEO Statement of Policy

"Subject: *EEO Policy*
"Celanese Trucking Division, historically has been committed to treating all employees with fairness. We have worked to create an atmosphere in which ability and performance are the main criteria for hiring, job assignments and advancement.
"Anyone, regardless of race, sex, age, religion, national origin, handicap, or Veteran status is entitled to work in an environment free of harassment and is given the opportunity to advance based upon demonstrated ability.
"This dedication to fairness underlies our Equal Employment Opportunity (EEO) programs. Celanese Trucking Division is proud of our progress in applying this EEO policy in our area.
"More remains to be done. First we must realize that representation of all groups at all levels of the work force is a long-term pledge. It is not something that can be accomplished overnight, but requires constant effort and attention.
"Second, we must continue to provide qualified employees with opportunities to develop their abilities and to advance.

"Finally, and perhaps most importantly, we must ensure that the Celanese policy of fairness is understood—and practiced—by all Celanese Trucking Division employees.

/s/ John S. Eason

J.S. Eason
Manager"

50. Neither notice mentions the Equal Employment Opportunity *Commission* (EEOC) or any state agency from which plaintiff could obtain information about her obligation under 42 U.S.C. § 2000e–5(e) to file a timely charge of discrimination with the EEOC.

51. The notice contained at Defendants' Exhibit 77 refers "questions regarding the trucking division's affirmative action program" to J.T. Gaffney. Mr. Gaffney was the Celanese official who assisted Mr. Eason in investigating plaintiff's complaint about the July 20 incident. Neither Mr. Gaffney nor any other Celanese employee ever informed plaintiff that she could file a charge of discrimination with the EEOC if she was dissatisfied with the manner in which defendants handled her complaint.

\* \* \* \* \* \*

## CONCLUSIONS OF LAW

### Jurisdiction

The court has jurisdiction of this action pursuant to 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1343(a)(4). Defendants Celanese Corporation and Celanese Fibers Operations are "employers" within the meaning of 42 U.S.C. § 2000e(b). Plaintiff Barbara Llewellyn is an "employee" within the meaning of 42 U.S.C. § 2000e(f).

### Venue

Venue is properly in the Western District of North Carolina under 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1391.

### Statute of Limitations

■ A person challenging a discriminatory term or condition of employment under Title VII must file an administrative charge with the Equal Employment Opportunity Commission within 180 days of the allegedly unlawful practice if no proper state agency procedure is available. 42 U.S.C. § 2000e–5(e).

The core of plaintiff's complaint is that she was exposed to sexually harassing conduct by defendants' employees and that defendants, with knowledge of that conduct, failed to take adequate and effectual action to eliminate it from the environment in which plaintiff worked. Plaintiff alleges that her absence from work caused by her nervous breakdown on August 17, 1983, was a constructive discharge.

■ The 180–day period for filing an EEOC charge begins to run when the last discriminatory act was committed. *United Air Lines v. Evans*, 431 U.S. 553, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1977). In a discriminatory termination case, the last discriminatory act is committed when the allegedly unlawful employment decision is communicated to plaintiff. *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980); *See, also, Chardon, et al. v. Fernandez, et al.*, 454 U.S. 6, 7–8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981). This is a constructive termination case. The discriminatory conduct at issue is composed of both harassing conduct by co-workers and supervisors' failure to respond effectively to plaintiff's complaint regarding that conduct. Even where no supervisor is a harasser, unless supervisory personnel take effective remedial action reasonably calculated to end the harassment, they are in passive complicity with the harassment. Under *Ricks*, therefore, the statutory period for filing the EEOC charge commenced running on August 16, 1983, the date when plaintiff learned of defendants' determination concerning her complaint about the July 20 incident at the Celco facility.

If the statute is strictly applied, the 180–day period lapsed on February 11, 1984. Plaintiff filed her EEOC charge on July 16, 1984, approximately five months later.

The EEOC subsequently issued to plaintiff notice of her right to sue on January 17, 1985. There is no dispute that plaintiff timely filed her lawsuit on April 12, 1985, within 90 days after receipt of her right to see letter from the EEOC.

■ The requirement of 42 U.S.C. § 2000e–5(e) that plaintiff file her EEOC charge within the 180–day period is a statute of limitations rather than a prerequisite to the court's subject matter jurisdiction. As a statute of limitations, it is subject to equitable estoppel or tolling when the circumstances of the case warrant such treatment. *Zipes, et al., v. Trans World Airlines*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982).

■ The facts of this case warrant equitable tolling of the statute of limitations because defendants failed to post a legally adequate notice as required by Title VII and plaintiff had no actual knowledge of the EEOC charge-filing requirements. *Vance v. Whirlpool Corporation*, 716 F.2d 1010, 1012–13 (4th Cir.1983), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984), 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984). (Failure to post notice required by ADEA tolled statute of limitations for filing EEOC charge until plaintiff had actual knowledge of his rights or retained an attorney.)

42 U.S.C. § 2000e–10 requires in pertinent part:

"Every employer ... shall post and keep posted in conspicuous places upon its premises where notices to employees, applicants for employment, and [union] members are customarily posted a notice *to be prepared or approved by the Commission setting forth* excerpts from or, summaries of the pertinent provisions of this subchapter and *information pertinent to the filing of a complaint.*" [Emphasis added.]

This provision of the statute was in effect during 1983. The EEOC had promulgated prior to 1983 the text of the required notice at 29 C.F.R. § 1601.30. That regulation provides in pertinent part:

"(a) Every employer ... shall post and keep posted in conspicuous places upon its premises where notices to employees ... are customarily posted, the following notice:

"EQUAL EMPLOYMENT OPPORTUNITY IS THE LAW

"DISCRIMINATION IS PROHIBITED

"By the Civil Rights Act of 1964, as amended, and by Executive Order Numbers 11246 and 11375.

"Title VII of the Civil Rights Act of 1964, as amended, administered by the Equal Employment Opportunity Commission prohibits discrimination because of Race, Color, Religion, Sex, or National Origin by employers with more than 15 employees ...

\*   \*   \*   \*   \*   \*

"Any person who believes he or she has been discriminated against should contact:

"The Equal Employment Opportunity Commission, 2401 E Street, N.W., Washington, D.C. 20506 or any of its district offices."

\*   \*   \*   \*   \*   \*

Defendants did not post this notice. Prior to August 17, 1983, defendants had posted two other notices. The full texts of these notices are set forth at paragraph 49, *supra.* Neither of these notices mentions the EEOC.

The portion of the notice required by the Code of Federal Regulations which directs complainants to the EEOC fulfills the statutory mandate that the notice contain information "pertinent to the filing of a complaint." Defendants' failure to notify their employees of the EEOC procedure contributes to the failure of complainants to be aware of that procedure and make timely use of it. A notice directing complainants instead to consult with an official of defendants in order to discover statutory rights and obligations which may result in defendants' liability violates the spirit and the letter of the statutory notice required by § 2000e–10.

Plaintiff had no actual knowledge of her rights and duties under Title VII until she

first consulted with and retained her attorney on July 13, 1984. She acted diligently upon that consultation and filed her EEOC charge on July 16, 1984, a few days later. Plaintiff is entitled to have the statute tolled from August 17, 1983, until she retained her attorney on July 13, 1984. *Vance, supra.*

■ Equitable tolling may also be appropriate where a Title VII plaintiff failed to file the EEOC charge during the 180–day period due to mental or emotional disability. *Lopez v. Citibank,* 808 F.2d 905, 906 (1st Cir.1987); *Moody v. Bayliner Corp.,* 664 F.Supp. 232, 234 (E.D.N.C.1987). There has been no decision by the United States Supreme Court or the Court of Appeals for the Fourth Circuit clarifying the scope or application of this rule in this circuit. Some courts have held that plaintiff must show legal incompetence or institutionalization in order to be excused for filing the EEOC charge late. *See, e.g., Bassett v. Sterling Drug,* 578 F.Supp. 1244, 1247 (S.D.Ohio 1984). This court rejects such a narrow view in light of the remedial purpose of Title VII, following the lead of the most recent opinions on the issue. *See,* Lopez, 808 F.2d at 906; *Moody,* 664 F.Supp. at 234.

In a most thoughtful published decision on this issue, Chief Judge Britt of the Eastern District of North Carolina held that "the period for filing a charge with the EEOC in Title VII cases may be tolled, in the discretion of the court, for that period of time which mental incapacity rendered the plaintiff incapable of pursuing any remedy." *Moody,* 664 F.Supp. at 235. However, Judge Britt refused to toll the statute in the case before him. He concluded that the evidence before him showed that plaintiff was capable of filing the EEOC charge within the 180–day period because there was no improvement or significant change in plaintiff's condition between the date her employment was terminated and the time she filed her EEOC charge challenging the termination. His conclusion was also based on the fact that plaintiff had retained an attorney before the 180–day period expired. *Id.* at 236.

■ This court holds that the facts of this case justify the application of equitable tolling. Barbara Llewellyn went on medical leave because of severe emotional and physical symptoms. She was diagnosed as suffering from depression and anxiety complicated by a seizure disorder, possibly epilepsy. She was given a variety of medications which, in combination with her illness, significantly impaired her ability to focus on the world around her and to accomplish everyday activities. The degree to which her functioning was actually impaired undoubtedly varied during her medical leave. However, the combined effect of her symptoms, the drugs, and the focus of her doctors on her seizure disorder served to divert her attention and the attention of her doctors from the psychogenic origin of her illness and from the hostile work environment which contributed to it. Once her seizure disorder was diagnosed on May 18, 1984, as "probably psychogenic," the focus of her therapy shifted to her experience and stimulated her awareness of and her ability to pursue her claim against her employer.

This court holds that defendants' failure to post the statutorily-required notice *and* plaintiff's mentally disabled condition justify tolling the statute of limitations from August 16, 1983, when plaintiff learned of defendants' determination of her complaint about sexual harassment, until July 13, 1984, when plaintiff first consulted her attorney and learned that she was required to file a charge with the EEOC. Plaintiff filed her EEOC charge on July 16, 1984, approximately three days after learning of her cause of action and of the filing requirements for challenging the unlawful employment practice, well within the statutory period. Thus the court may reach the merits of her claim.

*Sexual Harassment*

■ Sexual harassment carried out, or actively or passively condoned by supervisory personnel, is a practice prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1). *Meritor Savings Bank, FSB, v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

The Supreme Court explicitly recognized in *Meritor* the analysis of several lower courts dividing sexual harassment into two types. Sexual harassment is either *"quid pro quo"* harassment in which a supervisor demands sexual consideration in exchange for job benefits, or "condition of work" harassment resulting from a hostile or offensive work environment. *Meritor*, 106 S.Ct. at 2405.

Plaintiff claims that she was subjected to a hostile and offensive work environment on account of her sex, and that her employer, with knowledge of these conditions, failed to take adequate and effectual remedial action. The Fourth Circuit established a framework for analysis of such claims in *Katz v. Dole*, 709 F.2d 251 (4th Cir.1983):

"... First, the plaintiff must make a *prima facie* showing that sexually harassing actions took place, and if this is done, the employer may rebut the showing either directly, by proving that the events did not take place, or indirectly, by showing that they were isolated or genuinely trivial. Second, the plaintiff must show that the employer knew or should have known of the harassment, and took no *effectual* action to correct the situation. This showing can also be rebutted by the employer directly, or by pointing to *prompt remedial action reasonably calculated* to end the harassment."

*Katz v. Dole*, 709 F.2d at 256 (emphasis added).

■ Plaintiff met her burden of showing that she was subjected to harassment on account of her sex. These actions include those directed at her sexuality or expressed in a sexual manner, and those threats of violence against her for complaining about the sexually-expressed harassment. Plaintiff was subjected to a work environment in which her innermost privacy was intentionally assaulted by co-workers. The evidence is equally clear that those incidents were neither isolated nor trivial.

The court is also persuaded that supervisory employees of defendants knew or should have known of many of those incidents. Plaintiff reported several of the incidents to her dispatchers. The dispatchers were appropriate employees to receive such reporting. They were in most frequent contact with drivers and were responsible for passing information up the corporate hierarchy to supervisory personnel.

Plaintiff reported several incidents directly to Joe Snyder, her supervisor, and to other appropriate supervisory employees such as Chet Moody, the director of safety.

There is no dispute that appropriate Celanese employees knew about the July 20 incident at the Celco facility.

The critical issue in determining whether defendants are liable for the harassment plaintiff suffered is the question whether defendants' supervisory employees took prompt remedial action which was effectual and reasonably calculated to end the harassment. *Katz*, supra, 707 F.2d at 256. This court holds that defendants' investigation and resolution of plaintiff's complaint about the July 20 incident falls far short of this standard.

Prior to plaintiff's complaint about the July 20, 1984, incident, plaintiff's supervisor, Joe Snyder, knew that Gene Krampf had on at least one other occasion engaged in verbal harassment of plaintiff which involved a discussion of her sexuality.

Eason, who investigated the July 20 incident, had constructive knowledge of the 1982 incident. After receiving plaintiff's written complaint on July 23, 1984, Eason or his subordinate, Gaffney, failed to interview Krampf until August 8, 1984. Plaintiff's allegations concerning the July 20 incident were serious. Plaintiff's report to Joe Snyder on July 23 that she had been threatened for reporting the July 20 incident made the situation more serious. Despite plaintiff's repeated inquiries to Mr. Eason about the resolution of her complaint, it took Celanese officials another two weeks to talk to Mr. Krampf. This inaction is evidence of defendants' callous disregard for plaintiff's claim of harassment and the threat to her safety.

Eason's actions in investigating plaintiff's complaint and determining appropriate discipline defy common sense, and belie any genuine attempt to determine whether plaintiff's allegations were true. Eason's

statement on cross-examination that plaintiff's and Krampf's statements did not significantly differ is patently inaccurate. Eason's actions speak of a callous indifference to plaintiff's complaint and an irresponsible approach to determining whether her allegations had merit.

Eason's decision to put a warning letter in Krampf's file as a disciplinary measure was based only on the conduct Krampf admitted. Eason appears to have decided without justification that plaintiff was lying when she stated that Krampf was "standing there nude, smiling."

The court can only conclude that defendants did not take seriously plaintiff's allegations that Krampf intentionally exposed himself to her. Defendants' conduct falls below the standard required by *Katz*, and is an appropriate basis on which to hold them liable for the co-worker harassment plaintiff suffered.

*Constructive Discharge*

 An employee is constructively discharged when her or his employer deliberately makes that employee's working conditions such that a reasonable person would find them intolerable. *Bristow v. Daily Press*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986); *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985).

Barbara Llewellyn's working conditions were such that any reasonable person would have been forced to leave. No one should be required in order to keep a job to endure the sexual harassment and threats of violence she experienced. Even though Ms. Llewellyn did not quit, her medical leave without pay was caused by her intolerable work situation. As such, it was a constructive discharge for the purpose of back pay liability.

The intent of Celanese supervisory employees to force Ms. Llewellyn to leave may be inferred from circumstantial evidence, "... *including a failure to act in the face of known intolerable conditions.*" *Bristow*, 770 F.2d at 1255, quoting *Holsey*,

743 F.2d at 209. [Emphasis added.] The court finds that the failure of Celanese supervisory personnel to take adequate remedial action, as discussed above, evinces an intent to force her to quit.

The court holds that plaintiff was constructively discharged on August 16, 1983, and awards her back pay from that date until she was rehired by Celanese in November, 1986, less her earnings from other employment during that period.

Counsel for plaintiff is directed to tender a judgment appropriate to these findings and conclusions.