**Edward S. MONEY and Reginald Smith, Plaintiffs,**

v.

**GREAT BEND PACKING CO., INC., Teamsters Local Union 795, Richard Rock, Susette M. Jones Schwartz, and Larry Landwehr, Defendants.**

No. 89–1595–C.

United States District Court, D. Kansas.

Jan. 22, 1992.

William L. Fry, Dwight A. Corrin, Corrin & Krysl, Wichita, Kan., for plaintiffs.

K. Gary Sebelius, Catherine A. Walter, Davis, Wright, Unrein, Hummer & McCallister, Topeka, Kan., Artie E. Vaughn, Richard H. Seaton, Jr., Cordry & Hartman, Wichita, Kan., Kent A. Roth, Feldt & Roth, P.A., Great Bend, Kan., for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

On November 14, 1989, Edward S. Money and Reginald Smith filed this action for

wrongful termination from their employment at the Great Bend Packing Company, Inc. (GBC). In December 1987, both Money and Smith's employment with GBC was terminated following an investigation of allegations by another GBC employee, Eddie Givens, that Money and Smith were involved in dealing drugs to GBC employees. Money and Smith filed this action, seeking recovery pursuant to 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981[1] and 42 U.S.C. §§ 1985 and 1986. The plaintiffs also assert pendent state law claims for violation of the Kansas Act Against Discrimination, invasion of privacy and wrongful discharge under Kansas law and an interference with contractual relationship by the Teamsters Local Union 795 (Teamsters) and Larry Landwehr, assistant business manager of the Teamsters.

This case comes before the court upon several motions of the defendants:

Larry Landwehr and Teamsters Local Union 795 motion for dismissal and/or summary judgment. (Dk. 126).

Susette M. Jones Schwartz' motion for dismissal and/or summary judgment. (Dk. 127). Schwartz' motion adopts Landwehr/Teamsters' brief.

Motion by GBC, Richard Rock and Jim Britton[2] for summary judgment. (Dk. 143).

The plaintiff has filed a response to each of these motions, GBC and Rock have filed a reply brief. (Dk. 159).

### Standard for Summary Judgment

■ Summary judgment is appropriate when the movant can demonstrate that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Fed.R.Civ.P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

■ An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249, 106 S.Ct. at 2510. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is inappropriate. *See Riley v. Brown & Root, Inc.,* 896 F.2d 474, 476–77 (10th Cir.1990).

■ At the outset, the court notes that the plaintiffs' response to GBC and Rock's motion for summary judgment does not comply with local rule D.Kan. 206.[3] D.Kan. 206(c), in pertinent part states:

Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies, and if applicable, shall state the number of movant's fact that is disputed. All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party....

---

1. The parties have stipulated to the dismissal of all of the plaintiffs' § 1981 claims with prejudice. (Dk. 151). On May 29, 1991, the court dismissed those § 1981 claims with prejudice. (Dk. 152).

2. On July 3, 1991, all of the parties filed a stipulation dismissing Jim Britton. (Dk. 158). On July 7, 1991, the court entered an order dismissing Jim Britton with prejudice. (Dk. 160).

3. In that response, the plaintiffs also identify Kansas law as the law governing this court's determination of the procedural aspects of the defendants' motion for summary judgment. In federal court, procedural matters are governed by federal law, not state procedural law. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The plaintiffs' response does not specifically controvert any of the defendants' statement of facts. Instead, in a section titled *"Additional Facts Necessary to Consider,"* the plaintiffs identify other "facts" they deem relevant. D.Kan. Rule 206 serves several valuable purposes, including reducing the burden placed upon the court in determining motions for summary judgment. In accordance with the local rule, the court deems the defendants' statement of facts as admitted.

In addition, the plaintiffs' response to the Landwehr/Teamster's brief refers to several deposition exhibits or to "facts" which are not supported by any portion of the record. In considering the defendants' motions for summary judgment, the court has accepted as fact any allegation that is admitted. The court has disregarded any assertion or allegation by any party unsupported by the record.[4] *See* D.Kan. Rule 206(c).

### *Uncontroverted Facts*

In deciding each of the defendants' motions, the court has, where appropriate, considered each of the party's motions separately. However, rather than set forth two separate recitations of the facts, the court has endeavored to condense the relevant uncontroverted facts into a single account. The court has also attempted to cull out the facts irrelevant to the disposition of this case.

GBC is a meat packing facility. Richard Rock was the president of GBC. Jim Britton was the plant manager. In 1985, GBC hired Susette Schwartz as the Director of Human Resources and Director of Labor Relations. In September 1986, Schwartz also assumed the responsibilities as General Counsel for GBC.

On June 25, 1982, Money was hired by GBC as an hourly employee. On September 20, 1982, Money was promoted to a supervisory position. On May 19, 1982, Smith was hired by GBC as an hourly employee within the bacon department. On September 11, 1982, Smith was promoted to a supervisory position. In 1987, Smith was promoted to Assistant Plant Manager of the GBC. Money and Smith are black males. Both Money and Smith were at-will employees of GBC. During their employment at GBC, neither Money or Smith were denied promotions for which they sought. Both plaintiffs apparently received very favorable job evaluations prior to their termination.

During Money's employment at GBC, neither Rock nor Britton, or any other supervisor ever made a racially derogatory comment to him. Nor is Smith aware of any racially derogatory statements directed toward him by any of the defendants. The Teamsters apparently requested GBC to fire the plaintiffs prior to the specific events which lead to each plaintiff's termination. The Teamsters requested each plaintiff's termination as it was the union's impression that the plaintiffs were "too hard on" the workers they supervised.

It was Rock's policy to fire any GBC employee he believed to be involved in drugs. GBC's written policy had a written provision which stated that possession of alcoholic beverages or drugs on company property at any time was conduct justifying termination. In furtherance of that policy, GBC posted a notice which provided that GBC would pay a cash reward of $1,000 to anyone who provided information that leads to the arrest and conviction of any person involved in the sale of narcotics on company property. GBC was apparently cognizant of a drug problem on company property.

Both plaintiffs reviewed GBC's notice pertaining to the $1,000 reward during their employment at GBC. The plaintiffs understood that if a GBC employee was involved in illegal drug deals or drug possession on GBC property that such conduct would be an offense justifying termination.

On November 4, 1987, Eddie Givens, a black GBC employee was terminated for walking off the job. Givens did not have an exemplary work record with GBC. On

---

**4.** In any event, even if the court were to accept many of the "facts" supposedly evidenced by the deposition exhibits, the court's disposition of these motions would not differ.

November 9, 1987, Givens filed a grievance against Smith, complaining of harassment by Smith. Givens claimed, *inter alia*, that Smith asked Givens to acquire drugs and sometimes sell them for Smith in order to keep his job. Givens requested reinstatement.

On November 10, 1987, Schwartz met with Eddie Givens and Galen Hulse, Union Steward, to discuss the grievance filed by Givens. During the meeting, Givens stated that he had been making drug deals for Smith and that Smith would let Givens leave work early so that he could purchase drugs for Smith. Givens also indicated that he had sold drugs to Money.

Upon learning of Givens allegations, Rock directed Schwartz to request Givens to take a polygraph test. Rock, who had experience in plant operations, was aware of the possibility that a worker might fabricate a story in order to preserve his own job or to implicate a supervisor.

On November 19, 1987, Hulse provided Schwartz with a written statement by Givens which made additional allegations concerning Givens' drug sales to Smith and Money. On November 19, 1987, Givens was given a polygraph test. The questions asked during the polygraph test centered on Givens' allegations about Smith. The test indicated Givens' responses to the questions asked were not deceptive. Schwartz advised Rock of Givens' polygraph test results.

On November 19, 1987, Schwartz, Britton and Doug Moore [5] met with Smith and informed him that he had been implicated in a drug deal. Schwartz also indicated that Givens had taken and passed a polygraph test and that Smith would be given an opportunity to take a polygraph test and a blood screen to clear himself. Smith agreed to take the blood screening test and polygraph test.[6]

On the afternoon of November 19, 1987, Schwartz drove Smith to Dr. Unrein's office for the purpose of giving Smith a blood screen. The drug screens were given in order to insure that the polygraph results were not affected by the presence of drugs in the person taking the test. Smith's drug screen was negative.

Later that afternoon, James A. Pike administered a polygraph test to Smith. The results of the test indicated deceptive answers to questions pertaining to Givens' accusations. Specifically, these questions were asked and the results indicated deception:

Q: Have you ever conspired with Ed Money to buy and sell drugs at a profit?

A: No.

Q: Have you and Ed Givens ever made any drug deals?

A: No.

Q: Did you threaten to fire Ed Givens after he said he would sell you no more drugs?

A: No.

Q: Have you ever used any illegal substance on any lunch break?

A: No.

After Smith was dropped off, Schwartz, Hulse, Moore and Landwehr and Pike met at a restaurant to discuss Pike's findings. After hearing Pike's findings, Landwehr requested that Money be administered a polygraph as well. Landwehr also suggested additional questions.

---

5. On March 4, 1991, this court entered an order dismissing Doug Moore from this case without prejudice. (Dk. 140).

6. The plaintiffs contend that the polygraph tests were wholly unreliable. The plaintiffs, however, point to no evidence in the record, other than their own assertion, that the polygraph tests were improper, biased or unreliable. While the plaintiffs contend that they intend to produce evidence at trial that the polygraph operator was unqualified (Dk. 139/154), that possibility does not create an issue of fact in deciding these motions for summary judgment.

In this same vein, the plaintiffs note that approximately six months after they were asked to take polygraph tests Congress passed legislation making it unlawful for an employer to request an employee to take polygraph test. *See* 29 U.S.C. § 2001, *et seq.* The plaintiffs suggest that GBC knew or should have known about the pending legislation. The court is unpersuaded that the subsequent enactment of legislation making it unlawful to require an employee to take a polygraph test somehow taints GBC's use of polygraph test in its investigation of Givens' allegation.

Rock learned of Givens' allegations against Money after he learned of similar allegations against Smith. After Schwartz informed Rock of Givens' specific allegations against Money, Rock directed Schwartz to ask Givens if he would take a second polygraph test. Givens agreed to take another polygraph test. A second polygraph test was administered to Givens. That test indicated no deception in response to questions pertaining to Givens' allegations against the plaintiffs.

After the results of Givens' second polygraph test, Rock directed Schwartz to meet with Money and explain Givens' allegations against Money in the same manner in which she had been directed to advise Smith.

On November 24, 1987, Money attended a meeting with Schwartz, Britton and Moore. Schwartz advised Money that he had been implicated by Givens' grievance. Schwartz asked whether Money would take a polygraph and submit to a drug screen. Money initially indicated that he would not take the tests, but when advised that if he did not take the test he would probably be suspended until the investigation was over and then probably be terminated, Money stated that he would take the drug screen and the polygraph test. Money was aware that Givens had been given and passed his polygraph test.

On November 24, 1987, James A. Pike administered a polygraph test to Money; following the test Money returned to work. Although Pike was uncertain about the results of Money's November 24, 1987, polygraph test, the written report received by GBC indicated deception by Money in regard to several questions, including deception to the following questions:

Q: Have you and Eddie Givens ever made any drug deals?

A: No.

Q: Have you conspired with Reggie Smith to buy and sell drugs at a profit?

A: No.

Q: Have you ever used any illegal substance on lunch or any break?

A: No.

Rock was initially advised that Money's polygraph results were indecisive. After learning that the polygraph tests indicated deception, Rock advised Susie Schwartz to ask Money to take a second polygraph test by another examiner. Schwartz advised Money that GBC wanted Money to take another polygraph test because he had either failed a couple of questions on the first polygraph test or that there was some question concerning the first polygraph test.

Money initially indicated that he would not take the test again. After Schwartz shared some of the questions that were asked of Givens, Money agreed to take a second polygraph test if he were allowed to answer the same questions asked Givens. On December 10, 1987, Roger D. Butler of Mid–Plains Polygraph and Security, Inc. administered a second polygraph test to Money. That polygraph test included the same questions asked Givens. The report from Mid–Plains Polygraph indicated deception in regard to Money's answers to the following questions:

Q: Have you and Eddie Givens ever made any drug deals?

A: No.

Q. Have you ever conspired with Reggie Smith to buy and sell drugs at a profit?

A: No.

Q: Did you ever provide Eddie Givens any money to buy drugs?

A: No.

Q: Did you direct Eddie Givens to distribute illegal drugs?

A: No.

Doug Moore picked up Money after his second polygraph test and took him back to the GBC plant. Moore told Money to gather his personal belongings.

Throughout this same time frame, the Teamsters had been conducting an independent investigation of Givens' grievance. Apparently, the Teamsters focused on developing a defense to Givens' "walk-off." In contrast, Rock focused on determining whether his supervisors were involved in drugs having a direct relationship to the plant.

Some of the information which the Teamsters discovered was not shared with GBC as the Teamsters believed that it was the union's responsibility to keep certain information about its members confidential.

As indicated above, the Teamsters, through Landwehr, apparently urged the use of polygraph tests in the investigation of Givens' allegations. The ultimate decision to use polygraph tests during the investigation was Rock's. The Teamsters were apparently apprised of the results of the polygraph tests. Landwehr met with Schwartz following Money's polygraph; Landwehr was apparently disgruntled that Money was at that time going to return to work at GBC.

Rock made the decision to terminate Smith's employment.[7] According to Rock, that decision was made following GBC's investigation[8] of Givens' grievance and his belief that Smith had violated GBC policy. On December 3, 1987, Smith was advised by letter, dated December 1, 1987, that his employment with GBC was terminated. Following Smith's termination from GBC, James Beverly, a black male, replaced Smith as line supervisor. The Assistant Plant Manager position was not utilized after Smith's termination from employment.

Rock made the decision to terminate Money. According to Rock the decision was made following the investigation of Givens' grievance and Rock's determination that Money had violated GBC policy. On December 12, 1987, Money received notification of his termination. Clarence Crom, a white male, replaced Money as a supervisor at GBC following Money's termination.

The Teamsters did not have the authority to make termination decisions nor was the union directly involved in the decision to terminate the plaintiffs' employment. During GBC's investigation of Givens' grievance, Landwehr telephoned Rock and asked Rock what Rock's policy was in regard to supervisors using drugs. Rock replied that anybody that is involved in drugs in the GBC plant would be terminated. That was the only conversation Rock had with anyone associated with the Teamsters.

On May 2, 1988, Money filed a complaint of discrimination with the Kansas Commission on Civil Rights (KCCR). On October 10, 1988, Money filed an amended complaint of discrimination with the KCCR. On October 3, 1988, Money also signed a "request to file with the Equal Employment Opportunity Commission." On October 3, 1988, Money signed document titled "Charge of Discrimination" on EEOC form 5. On October 31, 1988, the KCCR received Money's EEOC charge of discrimination. As late as December 7, 1989, the EEOC had no record of any documents filed by Money with the EEOC. By a letter dated June 12, 1989, Arthur R. Bruce, Supervisor of Compliance for the KCCR, advised Money that the KCCR had determined that there was "no probable cause" to credit the allegations found in Money's KCCR Complaint.

On May 2, 1988, Smith filed a complaint of discrimination with the KCCR. On October 14, 1988, Smith signed a "request to file with Equal Opportunity Commission." On October 14, 1988, Smith also signed a document titled "Charge of Discrimination" on EEOC form 5. On November 3, 1988, Smith filed an amended complaint of discrimination with the KCCR. The KCCR records indicate that Smith's EEOC charge of discrimination and the request to file with the EEOC were received by the KCCR office on November 3, 1988. As late as December 7, 1989, however, the EEOC had no record of any documents filed by Smith with the EEOC. By letter dated March 23, 1989, Bruce advised Smith that the KCCR had determined that there was "no probable cause" to credit the allegations of Smith's KCCR Complaint.

---

**7.** The plaintiffs admit that Rock made the ultimate decision to terminate both plaintiffs' employment. The plaintiffs contend, however, that the evidence suggests that the Teamsters influenced that decision.

**8.** Schwartz' investigation relied primarily on the polygraph tests; her investigation produced little or no tangible evidence to support Givens' allegations.

On November 14, 1989, the plaintiffs filed their complaint in this action.

## Title VII

### Are the Plaintiffs' Title VII claims time barred?

The defendants contend the plaintiffs' Title VII claims are time barred. The defendants contend that the plaintiffs failed to file a charge of discrimination with the EEOC within three hundred days of the alleged discriminatory act and therefore the plaintiffs' Title VII claims are barred from bringing any civil action alleging discrimination.

The position of certain defendants on this issue differs from the arguments of the other defendants. The Landwehr/Teamsters' brief (apparently erroneously) concedes that Money "filed his timely complaint with the KCCR and the EEOC, but did not name Larry Landwehr or Teamsters Local Union 795." The brief contends that Money's October 10, 1988, amended complaint with the KCCR which named Landwehr and the Teamsters as wrongdoers was three days beyond the time allowed by 2000e–5, i.e. 303 days after Money's termination from GBC.

In regard to Smith's claims, Landwehr and the Teamsters state that Smith "filed his timely complaint with the KCCR on May 2, 1988." Smith was terminated by a letter dated December 1, 1987. Because Smith did not name either Landwehr or the Teamsters until his amended KCCR complaint was filed on November 3, 1988, the defendants argue that 338 days had elapsed between Smith's termination and the filing of a complaint with the EEOC, thus barring Smith's Title VII claim.

Rock and GBC argue that because neither plaintiff filed a timely charge of discrimination with the EEOC, that neither defendant may maintain a Title VII claim as they are barred by § 2000e–5(e). In their reply brief, the defendants contend that the "only administrative agency to receive plaintiffs' attempted filing with the EEOC was the KCCR, but these were re-

ceived by and filed with the KCCR *after* the applicable 300 days had expired."

The plaintiffs' responses are difficult to synthesize. In regard to the Landwehr/Teamsters' brief, the plaintiffs suggest that they should be excused from naming Landwehr and the Teamsters as defendants, the plaintiffs contend that they were unaware of these defendants' wrongdoing until the KCCR conference August 18, 1988. The plaintiffs have included an affidavit from Dwight Corrin, the attorney that represented them at the time of the KCCR conference. In that affidavit, Corrin avers that it was not until the time of that conference that he was aware of Landwehr's and the Teamsters' possible involvement in any discrimination. Corrin avers:

> Though I cannot, at this date, pinpoint exact items and statements without a thorough review of the files, I can say that until that hearing I had not concluded that any additional parties be named, but that during the course of the conference I recall reacting to many of the statements: "why is Larry Landwehr so involved", in effect, and then, from all that was said, I felt that he, Mr. Landwehr, and the union, were certainly involved in influencing the Respondent employer to fire Plaintiffs. Had I had such information and reached such conclusion earlier, I would have brought this to the attention of the Plaintiffs and would have prepared amendments or agenda to their earlier complaints.

Upon learning of this information, the plaintiffs began the process of amending their complaints to add Landwehr and the Union. The plaintiffs contend that under these circumstances, the amendments should relate back to the original filing. The plaintiffs also contend that the period for filing a charge with the EEOC "begins to run when last discriminatory act is committed; last discriminatory act is committed when allegedly unlawful employment decision is communicated to employee" quoting the headnote from *Llewellyn v. Celanese Corp.*, 693 F.Supp. 369 (W.D.N.C. 1988).[9] The plaintiffs contend that because

**9.** This quote appears to be taken from headnote number 2 from *Llewellyn.* The headnotes, writ-

the actions of the Union were not communicated to them until the KCCR hearing in August, their amended complaint is timely.

In regard to Rock's and the Teamsters' brief, the plaintiffs apparently concede that neither of them filed with the EEOC within three hundred days of their termination. *See* Dk. 155 at p. 15–18. The plaintiffs, however, suggest that their filing with the KCCR was adequate as it is the plaintiffs' attorney's experience that a complaint with the KCCR on an EEOC "joint filing form" is usually transmitted to the EEOC. In this instance, the plaintiffs' complaints filed in May (which were not on joint filing forms), for whatever reason, were not transmitted to the EEOC. The plaintiffs' current attorney suggests that Corrin, Money and Smith must have believed that they were cross-filing with the EEOC when they filed with the KCCR. The plaintiffs once again cite to the headnote from *Llewellyn* and suggest that the pertinent date involved is August 18, 1988, the date the plaintiffs discovered Landwehr's and the Teamsters' involvement.

■■■ In a deferral state like Kansas, the claimant may institute proceedings with a state of local agency having the authority to grant or seek relief and then must file a discrimination charge with the EEOC within 300 days of the alleged unlawful employment practice. *Waller v. Consolidated Freightways*, 767 F.Supp. 1548, 1558 (D.Kan.1991) (citing *E.E.O.C. v. Commercial Office Products Co.*, 486 U.S. 107, 110, 108 S.Ct. 1666, 1668, 100 L.Ed.2d 96 (1988)). The "filing of a timely charge with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982).

■■■ In the case at bar, apparently neither plaintiff filed a complaint within 300 days of the date they were terminated from their employment.[10] The plaintiffs appear to suggest that their May 1988 filing with the KCCR was in and of itself adequate to preserve their Title VII claims. 29 C.F.R. § 1601.13 (1988) provides:

(b) *Initial presentation of a charge to a 706 Agency.* (1) When a charge is initially presented to a 706 Agency and the charging party requests that the charge be presented to the Commission, the charge will be deemed to be filed with the Commission upon expiration of 60 (or where appropriate, 120) days after a written and signed statement of facts upon which the charge is based was sent to the 706 Agency by registered mail or was otherwise received by the 706 Agency, or upon the termination of 706 Agency proceedings, or upon waiver of the 706 Agency's right to exclusively process the charge, whichever is earliest. Such filing is timely if effected within 300 days from the date of the alleged violation.

The EEOC subsequently amended the procedural regulation to replace the phrase "706 Agency" with "FEP Agency." *See* 56 Fed.Reg. 9623 (1991).

In some instances a plaintiff who files with a 706 agency but fails to file his or her complaint with the EEOC will be deemed to have filed the charge with the EEOC. For example, in *Worthington v. Union Pacific Railroad*, 948 F.2d 477 (8th Cir.1991), the plaintiff filed her complaint with the state's "706 agency." While the plaintiff did not specifically request the agency to file her complaint with the EEOC, the plaintiff filed her charge on an EEOC form which was addressed to the EEOC and the state agency. Her complaint was assigned an EEOC

---

ten by West Publishing Co., are not part of the court's opinion and should not be cited as such.

**10.** The plaintiffs' reading of *Llewellyn* is incorrect; the plaintiffs are not entitled to an additional 180/300 from August 18, 1988. The plaintiffs' discrimination claims are based upon the defendants' wrongful terminations, which were communicated to the defendants in De-

cember 1987. Because the plaintiffs did not file with the EEOC within three hundred days of the date they were terminated from their employment, the plaintiffs are barred by 42 U.S.C. § 2000e–5. The plaintiffs do not allege that any further discrimination occurred subsequent to their termination in December 1987.

"charge number." The defendant argued that the plaintiff's EEOC complaint was untimely as the plaintiff failed to check the appropriate box on her complaint indicating that she wished to have her charge filed with the EEOC. The court of appeals rejected the defendant's contention and commented that the argument that the plaintiff's failure to check the appropriate box on the bottom of the form was not very convincing. Under those circumstances the plaintiff's charge was deemed submitted to both the 706 agency and the EEOC.

Apparently neither plaintiff requested the KCCR to file a charge with the EEOC within 300 days of their termination. Nor was either charge filed in May submitted on an EEOC form or given an EEOC "charge number." This case differs from *Worthington* as the plaintiffs have failed to demonstrate any legitimate reason or point to any facts that justify their failure to file with the EEOC. Therefore, in the absence of equitable tolling principles, the plaintiffs are time barred by 42 U.S.C. § 2000e–5.

■■■■ The time limits for filing charges with the EEOC are subject to equitable tolling. *Schloesser v. Kansas Dept. of Health and Env.*, 766 F.Supp. 984, 991 (D.Kan.1991). Appropriate grounds for equitable tolling include "instances where a party is 'actively misled' and 'lulled into inaction' by the conduct of his or her employer." *Schloesser*, 766 F.Supp. at 991. *See Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151, 104 S.Ct. 1723, 1725, 80 L.Ed.2d 196 (1984) (discussing circumstances justifying equitable tolling); *Foutty v. Equifax Services, Inc.*, 762 F.Supp. 295, 297–98 (D.Kan.1991), *reconsideration granted*, 764 F.Supp. 621

(D.Kan.1991) ("After reviewing the Tenth Circuit's equitable tolling cases, one common theme is discernable: a plaintiff must allege some affirmative conduct which is objectively misleading.") (collecting and discussing several Tenth Circuit cases discussing the principles of equitable tolling); *Scheerer v. Rose State College*, 774 F.Supp. 620, 625 (W.D.Okl.), *aff'd* 950 F.2d 661 (10th Cir.1991) (discussing instances where equitable tolling principles are appropriate).

■■■■ In the case at bar, the plaintiffs have not identified sufficient facts to support a claim for equitable tolling. The plaintiffs have apparently been represented by counsel since at least August 1988; at that time the plaintiffs could have filed a timely complaint with the EEOC. The plaintiffs' have pointed to no evidence that they were actively mislead or lulled into inaction by the defendants or the KCCR.[11] The plaintiffs' failure to timely file with the EEOC appears to be the plaintiffs' own fault. The court concludes that the plaintiffs' Title VII claims are barred by 42 U.S.C. § 2000e–5.[12]

*Assuming that the plaintiffs had timely filed their claims with the EEOC, have they demonstrated a genuine issue of fact in regard to their Title VII claims?*

■■■■ In the alternative, the defendants contend that the plaintiffs' have failed to identify any evidence indicating that they were terminated on the basis of race discrimination. All of the defendants appear to concede, at least for purposes of these motions, that the plaintiffs have presented a prima facie case of discrimination. The defendants contend, however, that the

11. The testimony from Money's deposition on page 56–57 regarding his discussions with the KCCR does not directly pertain to the necessity of filing with the EEOC. The KCCR apparently did not inform Money that it was not necessary to file his charge with the EEOC or request that it be filed with the EEOC. The plaintiffs' current attorney simply makes the assumption that the plaintiffs and their attorney were mislead by the KCCR as he states that they "must have believed they were cross-filing with the EEOC when the original complaint was filed."

12. The court has treated the defendants' motions for summary judgment on the basis of not filing a timely charge with the EEOC identically. Although Landwehr and the Teamsters erroneously conceded that the plaintiffs had filed complaints with the EEOC in May 1988, the plaintiffs' argument that their complaint should relate back to the May 1988 filing is without any factual basis. Because there is no filing to relate-back to, the plaintiffs' arguments that they timely filed with the EEOC are without merit.

plaintiffs have not rebutted the legitimate reasons for terminating their employment or demonstrated that the decision to terminate either plaintiff was based upon race discrimination.

The defendants claim that the only reason that the plaintiffs were terminated was their involvement in drug sales as evidenced by GBC's investigation of Givens' allegations. The defendants contend that there is absolutely no evidence indicating that these plaintiffs were terminated on the basis of race.

The plaintiffs assert that they were terminated solely on the basis of race. In support of this allegation, the plaintiffs attempt to rely on their civil rights complaints and the assertions contained in their affidavits attached to their civil rights complaints. The plaintiffs claim that they were terminated because the white workers they supervised did not want to be managed by black supervisors and that Rock terminated their employment solely to placate the desires of the Teamsters. The plaintiffs also claim that they were the only workers subjected to drug tests and polygraph tests. The plaintiffs also state that GBC's investigation procedures were violative of GBC's internal policies. The plaintiffs also contend that Givens' accusations are unfounded and challenge the efficacy of GBC's investigation.

While the plaintiffs concede that they have no evidence that Rock was racially prejudiced or used any racial slurs, they contend that Rock's decision to terminate them was based on race. The plaintiffs also point to a statement allegedly made by Schwartz that she disliked black people and reach the conclusion that her investigation was necessarily tainted by racial discrimination.

■ The standards for establishing a Title VII claim of discrimination are well settled. If the plaintiff proves a prima facie case of discrimination, the defendant must articulate a legitimate, nondiscriminatory reason, using admissible evidence, to explain why the plaintiff was terminated. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101

S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the defendant can articulate such a reason, in order to prevail, the plaintiff must demonstrate that the defendant's articulated reason is a mere pretext for unlawful discrimination. 450 U.S. at 256, 101 S.Ct. at 1095. *See Drake v. City of Fort Collins,* 927 F.2d 1156, 1160 (10th Cir.1991). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. *See Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

■ After careful review of all of the evidence and arguments presented, the court concludes that even if the plaintiffs had timely filed their EEOC charge, the defendants are entitled to summary judgment on the merits of the plaintiffs' Title VII claims. The court notes that the plaintiffs' reliance on their own unsupported allegations is inappropriate to defeat the defendants' motions for summary judgment. *See Nichols v. Hurley,* 921 F.2d 1101, 1113 (10th Cir.1990). Similarly, the plaintiffs' "feeling" that they are the victims of racial discrimination fails to demonstrate a material issue of fact in the absence of supporting evidence. *See Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300 (7th Cir.1991) (plaintiff's own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination).

Turning to the other issues raised by the plaintiffs, there is no evidence that Rock's decision to terminate the plaintiffs was based upon race. The evidence indicates that the plaintiffs were terminated following an investigation of Givens' allegations. Satisfied that Givens' allegations were true, Rock terminated the plaintiffs for violation of company policy. Even if GBC wrongly concluded that the plaintiffs were guilty of involvement in drug dealing, the defendants cannot be liable for racial dis-

crimination. *See Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1314 (6th Cir.1989); *Causey v. K & B Inc.,* 670 F.Supp. 681, 687 (E.D.La.1987). Similarly, there is no evidence to believe that GBC's investigation was merely a sham or pretext to foster good relations between GBC and the Teamsters.

In regard to the statement allegedly made by Schwartz two or three years prior to the plaintiffs' termination, even if she actually held such an unfortunate attitude about black persons, there is no evidence that attitude affected any GBC employee or any employment decision at GBC. *See* Moore's deposition, p. 35.

The plaintiffs understood that involvement with drugs while at GBC was a violation of company policy potentially warranting termination.[13] There is no evidence that GBC's decision to terminate the plaintiffs was not based upon its investigation of the relevant facts. *See Billups,* 922 F.2d at 1303. Similarly, there is no evidence that the Teamsters sought to have the plaintiffs discharged on the basis of their race.[14] In fact, the only suggestion that the plaintiffs were terminated on the basis of race comes from the plaintiffs themselves.

In short, the plaintiffs have failed to demonstrate any facts which would support a finding that GBC's termination of their employment for violation of company policy was pretextual. The plaintiffs' attempt to make an inference of racial discrimination is unsupported by the evidence. The plaintiffs have presented no direct evidence of discriminatory motive, nor have the plaintiffs presented indirect evidence sufficient to create a doubt as to the defen-

dants' motives in terminating their employment with GBC. *See Drake,* 927 F.2d at 1160.

### 42 U.S.C. § 1985(3)

The plaintiffs contend that they are the victims of a conspiracy and seek to recover under 42 U.S.C. § 1985(3). In response, the defendants contend that the plaintiffs have failed to identify any facts which support a claim of conspiracy to deprive the plaintiffs of any right protected by § 1985.

42 U.S.C. § 1985(3) provides in pertinent part:

If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons with such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

---

**13.** The plaintiffs' contention that the use of drug tests and polygraph tests violated company policy appears to be premised in part on the erroneous argument that possession or sale of drugs on GBC property was not a dischargeable offense. Both plaintiffs understood that possession or sale of drugs on GBC property was a dischargeable offense. In regard to the use of polygraph tests, it is not clear from the plaintiffs' exhibits that the use of a polygraph to investigate was in violation of company policy. In any event, assuming for the sake of argument that there was evidence that GBC had violated its own policies, the plaintiffs have failed to

demonstrate pretext in terminating their employment.

**14.** The plaintiffs did not specifically set forth the number of employees at GBC, the number of supervisors/managers at GBC or the race of any employees other than those already mentioned. Some statistics, however, can be gleaned from the KCCR report which is attached to the plaintiffs response to GBC's/ Rock's motion for summary judgment. The plaintiffs, do not, however, establish the race of the workers which they supervised.

**576**

Section 1985 does not create any substantive rights. *Dixon v. City of Lawton, Okl.*, 898 F.2d 1443, 1447 (10th Cir.1990). "[A] § 1985(3) claim generally describes a conspiracy of two or more persons for the purpose of depriving another of equal protection of the laws or equal privileges and immunities under the laws." *Id.* Section 1985(3) requires proof of conspiracy. *Id.* A claim under "§ 1985(3) requires proof that a conspirator's action was motivated by a class-based, invidiously discriminatory animus." *Id. See Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971); *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1272–73 (10th Cir.1989).

The defendants are entitled to summary judgment on plaintiffs § 1985(3) claims. First, the plaintiffs have not cogently articulated any identifiable right to which they were entitled from which they were deprived. Therefore, on its face, their § 1985(3) claim must fail; the court cannot discern from the plaintiffs' arguments an independent source to support their § 1985(3) claims. Section 1985(3) cannot be invoked to redress violations of Title VII. *Drake*, 927 F.2d at 1162–63 (quoting *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378, 99 S.Ct. 2345, 2352, 60 L.Ed.2d 957 (1979)). Second, assuming for the sake of argument that the plaintiffs had identified an independent source to support their § 1985(3) claims, the plaintiffs have failed to demonstrate a genuine issue of fact that the Teamsters and Landwehr conspired, motivated by racial animus, with the other defendants to deprive the plaintiffs of some protected right.

At best, the evidence indicates that the Teamsters were conducting their own investigation and that the Teamsters and Landwehr did have some communication with GBC through its agents. There is, however, no evidence to indicate the existence of a conspiracy. *See City of Omaha Employees Betterment Ass'n v. Omaha*, 883 F.2d 650, 653 (8th Cir.1989) ("Mere communications [between the Union and the defendant employer] are insufficient to establish an agreement to conspire against an individual employee.") The fact that GBC was desirous of good relations with the Teamsters does not demonstrate a conspiracy. Similarly, there is no evidence that anyone but Rock ultimately made the decision to terminate the plaintiffs' employment nor is there evidence that the plaintiffs were victims of any "conspiracy" motivated by class-based, invidiously discriminatory animus.

In sum, the defendants are entitled to summary judgment on the plaintiffs' 1985(3) claims.

### 42 U.S.C. § 1986

"42 U.S.C. § 1986 creates liability on the part of persons who 'refus[e] to take positive action where the circumstances demand to prevent acts which give rise to a [§ 1985(3) conspiracy] cause of action ...'" *Drake*, 927 F.2d at 1163 (quoting *Taylor v. Nichols*, 558 F.2d 561, 568 (10th Cir.1977)). Therefore, there can be no claim under § 1986 unless there is a valid § 1985 claim. *Id.; Lawton v. Medevac Mid–America, Inc.*, 138 F.R.D. 586, 589 (D.Kan.1991). The statute of limitations for bringing a § 1986 claim is one year. *Lawton*, 138 F.R.D. at 589 n. 2.

The plaintiffs apparently concede that their § 1986 claim is barred by the applicable statute of limitations. In any event, because the plaintiffs' § 1985(3) claim fails, their § 1986 claim must also fail.

The defendants are entitled to the summary judgment on the plaintiffs' § 1986 claims.

### Pendent State Claims

As the plaintiffs' federal claims were dismissed, the defendants suggest that the court should dismiss the plaintiffs' pendent state law claims. (Dk. 144, 159, 161). The plaintiffs do not directly respond to that request. After dismissal of all federal claims, remaining state claims will generally be dismissed. *Thatcher Enterprises v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir.1990). The decision to retain the pendent state claims lies in the discretion of the district court. *Id.*

The court concludes, in the interest of comity, that it is appropriate to dismiss the plaintiffs' pendent state claims for lack

of jurisdiction. The plaintiffs remaining claims turn on questions of state law. After reviewing the plaintiffs' remaining claims, the court, in the exercise of its discretion, dismisses all of the plaintiffs' remaining pendent state claims. *See Pitts v. Turner and Boisseau Chartered*, 850 F.2d 650, 653 (10th Cir.1988); *Churchman v. Pinkerton's, Inc.*, 756 F.Supp. 515, 521 (D.Kan.1991).

IT IS THEREFORE ORDERED that Larry Landwehr and Teamsters Local Union's 795 motion for dismissal and/or summary judgment (Dk. 126) is granted as to the plaintiffs' Title VII, § 1985(3) and § 1986 claims.

IT IS FURTHER ORDERED that Susette M. Jones Schwartz motion for dismissal and/or summary judgment (Dk. 127) is granted as to the plaintiffs' Title VII, § 1985(3) and § 1986 claims.

IT IS FURTHER ORDERED that GBC and Richard Rock's motion for summary judgment (Dk. 143) is granted as to the plaintiffs' Title VII, § 1985(3) and § 1986 claims.

IT IS FURTHER ORDERED that the plaintiffs' pendent state claims are dismissed for lack of jurisdiction.